**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

QWEST CORPORATION,
            *Plaintiff-Appellant,*

                    v.

CITY OF SURPRISE, a municipal
corporation,
                    *Defendant,*

                and

CITY OF TUCSON, Arizona, a
municipal corporation; CITY OF
GLOBE, Arizona, a municipal
corporation; CITY OF MIAMI,
Arizona, a municipal corporation;
CITY OF NOGALES, Arizona, a
municipal corporation,
            *Defendants-Appellees.*

No. 04-16940

D.C. No.
CV-01-02500-JAT

OPINION

Appeal from the United States District Court
for the District of Arizona
James A. Teilborg, District Judge, Presiding

Argued and Submitted
December 6, 2005—San Francisco, California

Filed January 13, 2006

Before: Stephen S. Trott, Thomas G. Nelson, and
Richard A. Paez, Circuit Judges.

Opinion by Judge Trott

707

**COUNSEL**

David R. Goodnight, Stoel Rives LLP, Seattle, Washington, for the plaintiff-appellant.

John H. Ridge, Stoel Rives LLP, Seattle, Washington, for the plaintiff-appellant.

Joseph Van Eaton, Miller & Van Eaton, PLLC, Washington, D.C., for defendants-appellees the City of Tucson.

Thomas K. Irvine, Irvine Law Firm, PA, Phoenix, Arizona, for defendants-appellees Cities of Nogales, Miami and Globe.

---

## OPINION

TROTT, Circuit Judge:

### OVERVIEW

Qwest Corporation (Qwest) appeals the district court's grant of summary judgment in favor of City of Tucson, City of Miami, City of Globe, and City of Nogales (collectively "the Cities"). Qwest contends that the Cities' telecommunications licensing and franchise ordinances are preempted by § 253 of the Federal Telecommunications Act of 1996 (the FTA). Qwest argues also that the Cities charge an improper rental fee for use of the Cities' rights-of-way. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we disagree with Qwest. The Cities' subsequent amendments to the ordinances exempt Qwest from the licensing and franchise ordinances, rendering moot Qwest's claims challenging these ordinances. Additionally, the charges that the Cities impose upon Qwest are taxes, not fees, so the Tax Injunction Act deprived the district court of jurisdiction to consider their validity.

### BACKGROUND

Qwest provides communication services to residents in the Cities. Qwest, in conjunction with its predecessors-in-interest, has provided telecommunications services throughout Arizona since prior to Arizona's statehood. In January 2002, Qwest filed an amended complaint alleging that the Cities were charging unlawful fees and imposing unlawful requirements on Qwest for use of the Cities' rights-of-way.

The Cities charge Qwest for operating in their respective

cities. The Cities' ordinances imposing this charge are not identical, but they are substantially similar.[1] The amount of the charge is determined as a percentage of Qwest's gross revenues and is as low as 2% and as high as 5%. Globe imposes the charge on all telecommunications providers, but Miami and Nogales charge only those telecommunications providers using their rights-of-way. Tucson imposes a 2% charge on all telecommunications providers, but charges an additional 1.5% for rights-of-way users. Only Tucson's ordinance is telecommunications specific; the other cities' ordinances apply to all public utility companies. Each of the Cities deposits the revenues into its general fund, and none of the funds are earmarked for expenses related to the rights-of-way.

In addition to these charges, the Cities' ordinances require that certain telecommunications providers obtain licenses and franchises before operating within the Cities. Qwest has always maintained that these licensing and franchise requirements do not apply to it because it operates pursuant to a grant of territorial franchise, which Qwest claims it received by operating in Arizona before it became a state.

In 1997, Arizona enacted a statute exempting telecommunications providers operating pursuant to a territorial franchise from local licensing and franchise requirements. Ariz. Rev. Stat. Ann. § 9-582(E). Despite the Arizona statute, the Cities' licensing and franchise ordinances remained unchanged and continued to apply to Qwest when it filed this action. Although the ordinances applied to Qwest, the Cities never enforced them against Qwest.

After Qwest commenced this action, the Cities enacted new ordinances exempting from their respective licensing and franchise requirements telecommunications providers operat-

---

[1]The challenged ordinances are section 19-1070(a) (Tucson); section 9-150 (Nogales); Ord. No. 170, section 28 (Miami); and section 8-3-8(H) (Globe).

ing under a claim of territorial franchise. For example, Tucson's ordinance reads,

> Section 7B-37. Exemption for pre-statehood telecommunications providers.
>
> The provisions of this chapter 7B shall not apply to any telecommunications provider in connection with the provision of wireline local exchange services who is providing, and with its predecessors-in-interest has been continuously providing, local exchange service within the city since prior to February 14, 1912, under a claim of a territorial franchise.

These new ordinances brought the Cities' ordinances in line with state law.

After a series of motions for summary judgment, the district court entered judgment in favor of the Cities on all claims. The court concluded that the Cities' charges were taxes and therefore saved from preemption by § 601 of the FTA. The court also dismissed Qwest's claims challenging Tucson's licensing and franchise requirements as moot because it found Qwest not subject to those ordinances. In a separate order, the district court dismissed Qwest's claims against Globe, Nogales, and Miami, concluding the claims were not ripe for review. The court noted it could also have dismissed these claims as moot. After dismissing Qwest's underlying claims as moot or not ripe, the district court dismissed as moot Qwest's § 1983 claim for damages. Qwest appeals these rulings.

## STANDARD OF REVIEW

The district court's grant of summary judgment is reviewed de novo, *San Jose Christian Coll. v. Morgan Hill*, 360 F.3d 1024, 1029 (9th Cir. 2004), and may be affirmed on any ground supported by the record. *Id.* at 1030. Mootness and

ripeness are questions of law also reviewed de novo. *Foster v. Carson*, 347 F.3d 742, 745 (9th Cir. 2003) (mootness); *Chang v. United States*, 327 F.3d 911, 921 (9th Cir. 2003) (ripeness).

## DISCUSSION

### A. Mootness

Qwest asserts two main arguments to prove that its § 253 preemption arguments are not moot. First, Qwest argues that the Cities' ordinances excluding Qwest from the licensing and franchise requirements are invalid under Arizona state law because they constitute special legislation. If Qwest is correct, its challenge to the licensing and franchise requirements would not be moot because it would be subject to those requirements. Second, Qwest argues its claims are not moot because Qwest still faces a real threat of future liability under the ordinances if its territorial franchise is adjudged invalid. We are persuaded by neither argument.

### 1. Qwest Lacks Standing to Challenge the New Ordinances

**[1]** Qwest argues that the Cities' new ordinances granting the exemption from the licensing and franchise requirements violate the Arizona constitutional prohibition against special legislation. Qwest, however, lacks standing to challenge the enactment of the ordinances because it suffered no injury in fact. A party must have standing as determined by federal law when litigating in federal court, even if the party is challenging a state law. *See Lee v. Am. Nat. Ins. Co.*, 260 F.3d 997, 1001-02 (9th Cir. 2001). The first standing requirement is that the party suffered an injury in fact. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* (quotation marks and citations omitted).

**[2]** Here, the challenged ordinances exempt Qwest from the Cities' licensing and franchise requirements, which is a benefit not an injury. Qwest argues that the ordinances are discriminatory because telecommunications providers that do not qualify for the exemption must make burdensome disclosures. While this contention might be true, Qwest suffers no injury when its competitors are subjected to additional, costly requirements. During oral argument, Qwest admitted that the only harm Qwest suffered from the ordinances' enactment is that Qwest can no longer adjudicate the merits of its preemption claim, but the ordinances provide Qwest with the very benefit it seeks on the merits—relief from the licensing and franchise requirements. Because Qwest has not suffered an injury in fact, it lacks standing to challenge the validity of the Cities' new ordinances under Arizona law.

## 2. New Ordinances Render Qwest's Arguments Moot

Qwest contends that the district court erred in dismissing its FTA claims against the Cities as moot or not ripe. Qwest admits it is currently not subject to the Cities' licensing and franchise ordinances because it falls within the exception created by section 7B-37, but argues it would become subject to the challenged ordinances if its territorial franchise were to be adjudged invalid by a future court. Although Nogales, Globe, and Miami stipulate to the validity of Qwest's territorial franchise, Tucson makes no such concession. Qwest therefore requests that we conclude that the Cities' licensing and franchise requirements are preempted by § 253(a) of the FTA to eliminate the possibility that Qwest would be subject to the ordinances in the future if somehow its territorial franchise were to be invalidated. Qwest expressly chose not to adjudicate the validity of its territorial franchise in this action.

"It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982).

"[I]n cases involving the amendment or repeal of a statute or ordinance, mootness is 'a matter relating to the exercise rather than the existence of judicial power.' " *Coral Constr. Co. v. King County*, 941 F.2d 910, 927 (9th Cir. 1991) (citations omitted). A court may continue to exercise jurisdiction over such a case where the balance of interests favor such continued authority. *Id.* "The party moving for dismissal on mootness grounds bears a heavy burden." *Id*. at 927-28.

**[3]** However, if a new law is enacted during the pendency of an appeal and resolves the parties' dispute, the case becomes moot for lack of a live case or controversy. *Kremens v. Bartley*, 431 U.S. 119, 128-29 (1977) (holding that enactment of new statute during pendency of appeal "clearly" mooted the claims); *City of Auburn v. Qwest Corp.*, 260 F.3d 1160, 1174 n.8 (9th Cir. 2001) ("Because [the new ordinance] grants Qwest a portion of the relief it seeks in its counterclaim, that portion of the counterclaim might also be considered moot.").

**[4]** Here, the Cities have met their "heavy burden" of showing that Qwest's claims are moot. First, there is no dispute that Qwest is currently exempt from the challenged ordinances. With respect to repose from future liability, Nogales, Miami, and Globe admit to the validity of Qwest's territorial franchise, so Qwest need not worry about those cities challenging the validity of its territorial franchise. Although Tucson refused to stipulate to the validity of Qwest's territorial franchise, it concedes Qwest is exempt under its ordinance and that Qwest would lose this exemption only if Qwest's territorial grant were invalidated by a future court—a question not before this Court. Therefore, any future liability is mere speculation at this time.

Second, the Cities will not likely repeal the ordinances granting the exemption. Where the challenged law would likely be reenacted, courts have refused to find the issue moot. For example, in *Coral Construction Co.*, we refused to dis-

miss a claim as moot because the district court had approved of the county's ordinance. 941 F.3d at 928. Thus, "not only could the County reenact its earlier ordinance, but it could do so without the spectre of a prior finding of unconstitutionality." *Id.* In *City of Mesquite*, the Supreme Court refused to dismiss a claim as moot because the city had announced an intention to reenact the same statute if the Court vacated the district court's judgment. 455 U.S. at 289.

**[5]** Here, the Cities enacted the new ordinances to conform their existing ordinances with Ariz. Rev. Stat. § 9-582(E). Even if the Cities had not enacted the new ordinances, the old ordinances would have been preempted by state law to the extent that they required Qwest to obtain a license or franchise. *See City of Auburn*, 260 F.3d at 1174 (holding that licensing and franchise ordinances were preempted by state law to the extent they required a telecommunications provider asserting a territorial franchise to obtain a franchise). Because any attempt to repeal the exemption would result in the ordinances being preempted by the state law exemption, it is unlikely that the Cities would repeal the ordinances granting the exemption.

**[6]** Third, the Cities have never required Qwest to comply with their franchise and licensing requirements even when the Cities' ordinances subjected Qwest to such requirements.[2] Thus, the Cities merely amended their ordinances to reflect their practice of exempting telecommunications companies with a claim of territorial franchise from the franchise and licensing requirements. *See Soranno v. Clark County*, 345 F.3d 1117, 1118-19 (9th Cir. 2003) (holding claim moot

---

[2]Tucson filed a quo warranto action challenging the validity of Qwest's territorial franchise in 1999. In that suit, Tucson challenged the question not before this Court—the validity of Qwest's territorial franchise. That action was dismissed on procedural grounds. *City of Tucson v. U.S. West Commc'n*, No. CV 99-329-TUC-FRZ (JCC), at *10 (D. Ariz. filed Aug. 30, 2002) (Report and Recommendation; adopted by District Court on Sept. 24, 2002).

where city updated ordinance to reflect its practice of not enforcing previous ordinance). As Nogales, Globe, and Miami emphasized in their Joint Answering Brief, "In nearly 90 years of statehood, the three Cities had never applied the supposed offensive provisions to Qwest, and there is no evidence they ever would do so. The Cities, therefore, had no reason to deal with this specious issue until this case was filed."

**[7]** Finally, Qwest argues that its claims are not moot because the franchise ordinances' penalty provisions continue to apply to Qwest. Qwest relies on *Jacobus v. Alaska*, 338 F.3d 1095, 1103 (9th Cir. 2003), where we concluded that "[d]espite superseding events, an issue is not moot if there are present effects that are legally significant." We then noted that, although two of the three challenged provisions had been repealed, the plaintiffs "will likely experience prosecution and civil penalties for their past violations of the repealed provisions of the Act." *Id.* at 1104. In *Jacobus*, it was undisputed that the plaintiffs violated the challenged provisions, which subjected them to civil and criminal liability. In fact, the state mailed to the plaintiffs a letter reserving the right to prosecute past violations. *Id.* The court therefore held that, "[i]n light of the ongoing civil and criminal ramifications of Plaintiffs' *past* violations, the claims are not moot." *Id.* (emphasis added).

**[8]** Qwest's situation is distinguishable from *Jacobus*. In *Jacobus*, the plaintiffs faced likely liability from their *past* conduct. Conversely, Qwest faces no potential liability from its past conduct because the parties agree Qwest is not subject to the licensing and franchise ordinances. Unlike the plaintiffs in *Jacobus*, Qwest is concerned about future liability should its territorial franchise ever be invalidated. When a party's only exposure to liability arises from speculative future events, the *Jacobus* concerns are inapplicable.

**[9]** In sum, here, as in *Kremens*, the newly enacted ordinances resolve the dispute before the court and extinguish the once live case or controversy. *See* 431 U.S. at 128-29. Any

threat Qwest might face is hypothetical until its territorial franchise is declared invalid by a future court. Because a live case or controversy no longer exists, we dismiss Qwest's claims challenging the licensing and franchise ordinances as moot.

## B.   District Court Lacked Jurisdiction to Invalidate the Cities' Taxes

Qwest argues that the FTA prevents the Cities from charging rent for the use of the public rights-of-way. The Cities do not dispute that they cannot charge rent. They argue instead that their charges constitute taxes, which are exempted from preemption by § 601 of the FTA. The district court agreed with the Cities and held that § 601 saved the Cities' charges from preemption. We agree with the district court that the Cities' charges are taxes, but we conclude the claim should have been dismissed under the Tax Injunction Act, 28 U.S.C. § 1341, for lack of subject matter jurisdiction.[3]

[10] We apply the *Bidart* test to determine whether a certain charge is a fee or a tax. *Bidart Bros. v. Cal. Apple Comm'n*, 73 F.3d 925, 931 (9th Cir. 1996). The test instructs courts to focus on three primary factors: (1) the entity that imposes the charge; (2) the parties upon whom the charge is imposed; and (3) whether the charge is expended for general public purposes, or used for the regulation or benefit of the parties upon whom the assessment is imposed. *Id.* When the first two *Bidart* factors are not dispositive, courts emphasize the third factor—the way in which the revenue is ultimately spent. *Id.* at 932.

The district court applied the *Bidart* test and found factors one and three weigh in favor of the charge being a tax and

---

[3]We recognize also that if the Tax Injunction Act did not apply, the district court correctly concluded that § 601 of the FTA saved the taxes from preemption.

factor two weighs in favor of it being a fee. Considering that previous courts have focused on the third factor when the first two are conflicting, the district court concluded that the charges are taxes because the revenues from the charges flow into the Cities' general funds.

**[11]** On appeal, Qwest does not dispute the district court's application of the *Bidart* test. Instead, Qwest argues that the *Bidart* test does not apply because when a government acts in a proprietary rather than a governmental capacity, its fees are never taxes. As the district court correctly concluded, this argument is fallacious. The *Bidart* test incorporates the distinction between proprietary and governmental power in its factors. For example, the third factor evaluates whether the revenues are spent to benefit the general public instead of a limited class of individuals. This factor is critical in distinguishing proprietary from governmental activities because a government does not ordinarily benefit the general public when it acts in a proprietary capacity. *See Black's Law Dictionary* 1256 (8th ed. 2004) (defining "proprietary function" as "[a] municipality's conduct that is performed for the profit or benefit of the municipality, rather than for the benefit of the general public."). Thus, the *Bidart* test addresses Qwest's concerns of proprietary versus governmental powers.

**[12]** Moreover, case law from other circuits does not support Qwest's position. Qwest cautions this Court against being the first court to declare such "rental fees" taxes. However, we blaze no new trails in reaching such a conclusion. Numerous other courts have concluded that charges imposed upon users of a city's rights-of-way are taxes for purposes of the Tax Injunction Act. *See, e.g.*, *Robinson Protective Alarm Co. v. City of Philadelphia*, 581 F.2d 371, 376 (3d Cir. 1978) (ordinance imposing 5% charge on gross revenues of companies using underground wires is a tax despite the state court labeling it a rental fee); *Keleher v. New England Tel. & Tel. Co.*, 947 F.2d 547, 549 (2d Cir. 1991) (ordinance requiring utility companies using and occupying city streets to pay

2.5% of their gross revenues as fees constituted a tax) *abrogated on other grounds by Jefferson County v. Acker*, 527 U.S. 423, 434 (1999); *City of Chattanooga v. Bellsouth Telecomm., Inc.*, 1 F.Supp.2d 809, 814 (E.D. Tenn. 1998) (ordinance imposing 5% charge on gross revenue of telecommunications providers that install cable on rights-of-way is a tax despite being labeled "rent" in the ordinance). In each of these cases, the court evaluated factors similar to those in the *Bidart* test in determining whether the charge was a tax or a fee. Qwest provided us with no case law, Ninth Circuit or otherwise, holding that charges similar to the Cities' charges constitute fees. Therefore, we hold that where, as here, an ordinance requires that a telecommunications provider pay a percentage of its gross revenues to the municipality, and the revenue from that charge is directed to the municipality's general fund, the charge constitutes a tax.

**[13]** Because the charges are taxes under the *Bidart* test, we must next determine whether the Tax Injunction Act deprived the district court of subject matter jurisdiction. The Tax Injunction Act provides, "The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. The Supreme Court interpreted the Tax Injunction Act as a "broad jurisdictional barrier." *Arkansas v. Farm Credit Servs. of Cent. Ark.*, 520 U.S. 821, 825 (1997) (quotation marks omitted). As the Court noted, the Act is "first and foremost a vehicle to limit drastically federal district court jurisdiction to interfere with so important a local concern as the collection of taxes." *Id.* at 826 (internal quotation marks omitted). Recently, we concluded that the dispositive question in determining whether the Tax Injunction Act's jurisdictional bar applies is whether the plaintiff's action, if successful, would reduce the flow of state tax revenue. *May Trucking Co. v. Or. Dep't of Transp.*, 388 F.3d 1261, 1267 (9th Cir. 2004) (citing *Hibbs v. Winn*, 542 U.S. 88, 106 (2004)).

**[14]** Here, there is no question that, if Qwest were success-ful on the merits, the Cities' tax revenues would be reduced. Qwest's purpose in challenging the Cities' ordinances is to avoid paying the taxes in the future. This type of challenge seeking to avoid paying a tax is the archetypical action that the Tax Injunction Act carves out of federal jurisdiction.

**[15]** Additionally, there is no evidence suggesting an ade-quate remedy is not available in Arizona courts. In fact, Qwest already challenged Tucson's tax in state court and lost. *U.S. West Commc'n v. City of Tucson*, 11 P.3d 1054, 1060-63 (Ariz. Ct. App. 2000). Therefore, we hold that the charges imposed upon Qwest are taxes, and that the Tax Injunction Act deprived the district court of jurisdiction to invalidate the taxes.

## CONCLUSION

Qwest is no longer subject to the Cities' licensing and fran-chise requirements, so its claims challenging these require-ments are moot. Because the underlying claims are moot, the Court need not address Qwest's § 1983 argument. Addition-ally, the Cities' charges are taxes, so the Tax Injunction Act deprived the district court of subject matter jurisdiction to invalidate the taxes.

**AFFIRMED IN PART; DISMISSED IN PART.**